AES:KTF/SME
F. #2016R01900

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - X

UNITED STATES OF AMERICA

- against -

JASON PELTZ,

        Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - - - X

<u>TO BE FILED UNDER SEAL</u>

COMPLAINT AND AFFIDAVIT IN SUPPORT OF <u>ARREST WARRANT</u>

(15 U.S.C. §§ 78j(b) and 78ff)

No. 20-M-1238

EASTERN DISTRICT OF NEW YORK, SS:

        Matthew Mahaffey, being duly sworn, deposes and states that he is a Special Agent with the Federal Bureau of Investigation, duly appointed according to law and acting as such.

        Upon information and belief, in or about and between February 2016 and March 2016, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendant JASON PELTZ, together with others, did knowingly and willfully use and employ one or more manipulative and deceptive devices and contrivances, contrary to Rule 10b-5 of the Rules and Regulations of the United States Securities and Exchange Commission ("SEC"), Title 17, Code of Federal Regulations, Section 240.10b-5, by: (a) employing one or more devices, schemes and artifices to defraud; (b) making one or more untrue statements of material fact and omitting to state one or more material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and (c) engaging in one or more acts, practices and courses of businesses which would and did operate as a fraud and deceit upon persons, to wit: on the basis of material, nonpublic

information that PELTZ obtained from an insider at issuer Ferro Corporation ("Ferro"), PELTZ executed or caused to be executed profitable transactions in the securities of Ferro, directly and indirectly, by use of means and instrumentalities of interstate commerce and the mails.

(Title 15, United States Code, Sections 78j(b) and 78ff)

The source of your deponent's information and the grounds for his belief are as follows:

1. I am a Special Agent with the Federal Bureau of Investigation ("FBI"), and have been for approximately four years. I am responsible for conducting and assisting in investigations into the activities of individuals and criminal groups responsible for securities fraud, wire fraud and other white collar crimes. I have participated in numerous white collar fraud investigations and have participated in all aspects of investigations, including conducting surveillance, executing search warrants, debriefing defendants and informants, interviewing witnesses, reviewing and analyzing recorded conversations, and analyzing telephone toll information.

2. I have personally participated in the investigation of securities fraud, wire fraud, money laundering and conspiracies to commit those crimes by the defendant JASON PELTZ and others, as discussed below. I am familiar with the facts and circumstances of this investigation from, among other things: (a) my personal participation in this investigation, (b) discussions with other law enforcement and regulatory personnel involved in this and parallel investigations, and (c) my review of various records and documents, among other sources of evidence.

3. Except as explicitly set forth below, I have not distinguished in this affidavit between facts of which I have personal knowledge and facts of which I learned from

other law enforcement and regulatory personnel. Because this affidavit is being submitted for the limited purpose of establishing probable cause to arrest the defendant JASON PELTZ, I have not set forth each and every fact learned during the course of this investigation. Instead, I have set forth only those facts that I believe are necessary to establish probable cause for the arrest warrant sought herein. In addition, where the contents of documents, or the actions, statements and conversations of others are reported herein, they are reported in sum and substance and in part, except where otherwise indicated.

I.      **Individuals and Relevant Entities**

4.      The defendant JASON PELTZ was a resident of Brooklyn, New York. He was a principal at a purported financial services firm (the "Peltz Financial Firm"). PELTZ was also the co-founder and Chief Executive Officer of a purported mobile application start-up company (the "Peltz Start-Up").

5.      Co-Conspirator 1 ("CC-1"), an individual whose identity is known to the affiant, was a resident of New York, New York. CC-1 was the Chairman, Chief Executive Officer and Managing Member of an investment firm specializing in specialty chemicals and performance materials (the "CC-1 Investment Firm"). During the relevant time period, CC-1 served on the Board of Directors of Ferro. Ferro, which used the ticker symbol FOE, was a company that made chemicals for the manufacturing industry with its principal place of business in Mayfield Heights, Ohio. In or about March 2016, Ferro received a takeover offer by a private equity firm (the "Takeover Bid"). On or about February 17, 2016, upon information and belief, Ferro held a Board of Directors meeting at which the Takeover Bid was discussed in confidence (the "Ferro Board Meeting"). Thus, as of mid-February 2016, CC-1 had knowledge of material, nonpublic information about the Takeover Bid.

6. CC-1's spouse ("CC-1's Spouse"), an individual whose identity is known to the affiant, was a longtime friend of the defendant JASON PELTZ.

7. Co-Conspirator 2 ("CC-2"), an individual whose identity is known to the affiant, was previously a resident of Oyster Bay, New York. During the relevant time period, CC-2 held a brokerage account at a brokerage firm (the "Brokerage Firm") (the "CC-2 Brokerage Account").

8. CC-2's domestic partner ("CC-2's Partner") resided in Oyster Bay, New York, with CC-2.

9. Co-Conspirator 3 ("CC-3"), an individual whose identity is known to the affiant, was a resident of Dubai, United Arab Emirates. During the relevant time period, CC-3 held a brokerage account at the Brokerage Firm (the "CC-3 Brokerage Account"). Co-Conspirator 4 ("CC-4"), an individual whose identity is known to the affiant, was a resident of Cold Spring Harbor, New York; the Chief Financial Officer of a real estate company based in Long Island, New York; and a relative of the defendant JASON PELTZ. During the relevant time period, CC-4 held a brokerage account at the Brokerage Firm (the "CC-4 Brokerage Account").

10. Co-Conspirator 5 ("CC-5") and Co-Conspirator 6 ("CC-6") were a married couple who resided in Long Island City, New York. In or about and between February 2016 and March 2016, CC-5 had multiple telephone contacts with the defendant JASON PELTZ.

11. Co-Conspirator 7 ("CC-7") resided in the New York City area and was an employee of the Peltz Start-Up. The defendant JASON PELTZ and CC-7 later became roommates.

## II.     Relevant Regulatory Principles and Definitions[1]

12.     An "issuer" is a legal entity that develops, registers and sells securities to finance its operations.   Issuers may be companies, corporations, investment trusts, or domestic or foreign governments.   Issuers are legally responsible for the obligations of the issue and for reporting financial conditions, material developments and any other operational activities as required by the regulations of their jurisdictions.   Issuers make available different types of securities, including preferred stocks, bonds and options.

13.     A "stock" is a type of security that signifies proportionate ownership in the issuing corporation.   This entitles the stockholder to that proportion of the corporation's assets and earnings.

14.     An "option contract," commonly referred to as an "option," is an agreement between two parties to facilitate a potential transaction on the underlying security at a preset price, referred to as the strike price, prior to the expiration date.   The two types of option contracts are "put" and "call" options, both of which can be purchased to speculate on the direction of stocks or stock indices, or sold to generate income.   For stock options, a single contract covers 100 shares of the underlying stock.

15.     A "call option" gives the holder of the option the right, but not the obligation, to purchase a specified amount of the underlying security at a specified price within a specific time period.   Generally, the holder of a call option anticipates that the price of the underlying security will increase during a specified amount of time.

---

[1] The information set forth in this section is based in part on my training and experience.

16. A "brokerage account" is an arrangement where an investor deposits money with a licensed brokerage firm, who places trades on behalf of the customer. Although the brokerage executes the orders, the assets belong to the investors.

17. An "Internet Protocol" address ("IP address") is a numerical label assigned to each device (e.g., computer, printer) participating in a computer network that used the Internet Protocol for communication. An IP address serves two principal functions: host or network interface identification and location addressing. Because every device that connects to the internet uses an IP address, IP address information can identify computers and other devices that are used to access the internet.

### III. The Fraudulent Scheme

#### A. Overview

18. The defendant JASON PELTZ engaged in a fraudulent scheme in which he obtained material, nonpublic information about the Takeover Bid. As described further below, PELTZ used that material, nonpublic information to (1) profitably trade in Ferro in advance of any public announcement of the Takeover Bid in the CC-2 and CC-3 Brokerage Accounts, and (2) tip CC-2, CC-4, CC-5, CC-6 and CC-7, each of whom also profitably traded on material nonpublic information about the Takeover Bid. PELTZ and CC-1 each received large financial benefits from certain co-conspirators shortly after providing the material, nonpublic information on which the co-conspirators traded.

#### B. PELTZ's Control of the Co-Conspirator Brokerage Accounts

19. Rather than execute securities transactions in a brokerage account in his name, which would be traceable to him, the defendant JASON PELTZ instead controlled or influenced the trading of securities in brokerage accounts held in other names, including the CC-2 and CC-3 Brokerage Accounts, as described below.

20. An IP address tracing back to the defendant JASON PELTZ was used to log in to both the CC-2 and CC-3 Brokerage Accounts on numerous occasions. Specifically, Verizon records for IP Address ending in .54 (the "Peltz IP Address") listed the account subscriber ("Individual 1"), an individual whose identity is known to the affiant, at an address in Long Island City, New York. According to public records, this address was both PELTZ's former personal address and the business address for the Peltz Start-Up. Moreover, public records listed Individual 1 as an employee of the Peltz Start-Up.

21. Recorded phone calls produced by the Brokerage Firm indicate that the defendant JASON PELTZ was involved in calls to the Brokerage Firm regarding the CC-2 and CC-3 Brokerage Accounts. For example:

  a. On or about November 24, 2015, an iPhone subscribed to by PELTZ with an assigned telephone number ending in -3202 (the "Peltz iPhone") called the Brokerage Firm regarding the CC-2 Brokerage Account. During the call with a representative from the Brokerage Firm, two different men spoke on behalf of the accountholder, one of whom was referred to as "J." Based on my training and experience and participation in this investigation, including a review of recordings from the Brokerage Firm, I believe one of the men is CC-2, and that the other man, "J," is PELTZ. Both men discussed with the Brokerage Firm representative the subject of accessing live data feed information for the CC-2 Brokerage Account.

  b. On or about February 4, 2016, a man who identified himself as CC-3 called the Brokerage Firm in reference to the CC-3 Brokerage Account. In the ensuing conversation, CC-3 simultaneously consulted with an individual named "Jason," who can be

heard speaking in the background. Based on my training and experience and participation in this investigation, I believe "Jason" is PELTZ.

### C. PELTZ's Relationship with Ferro Insider CC-1

22. I have reviewed numerous records evidencing the close relationship between the defendant JASON PELTZ and both CC-1 and CC-1's Spouse. I observed the following, among other things:

    a. CC-1's Spouse was one of PELTZ's most frequent contacts on the Peltz iPhone.

    b. Peltz invested with ▇, and also referred wealthy associates of his to invest with ▇.

    c. PELTZ represented CC-1 in discussions with CC-4 in or about March 2016 regarding the potential sale of CC-1's luxury residence in New York, New York.

    d. Peltz attended ▇ wedding in the British Virgin Islands on or about March 16, 2016, immediately after the Takeover Bid became public.

23. I have also reviewed records evidencing the contact between the defendant JASON PELTZ, CC-1, and CC-1's Spouse in the weeks prior to March 15, 2016, when the Takeover Bid became public. I observed the following, among other things:

    a. On or about February 17, 2016, following the Ferro Board Meeting, CC-1 had an approximately 23-minute phone conversation with CC-1's Spouse. CC-1 and CC-1's Spouse had additional phone contact with each other in the following days.

    b. PELTZ called and texted with CC-1 and CC-1's Spouse dozens of times in the two weeks following the Ferro Board Meeting.

    c. PELTZ and CC-1's Spouse had numerous phone contacts on or about the evening of February 21, 2016.

    d.  PELTZ took an Uber to the block on which CC-1 lives on or about March 13, 2016, two days before the Takeover Bid became public.

  D.  **Brokerage Accounts Trading in Ferro Following PELTZ-CC-1 Contact**

    1.  **PELTZ's Trades in CC-2 and CC-3's Brokerage Accounts**

  24.  On or about February 22, 2016—the morning immediately following the phone contact between CC-1's Spouse and the defendant JASON PELTZ—at approximately 9:08 a.m., shortly after the markets opened, the Peltz IP Address accessed the CC-2 Brokerage Account, which shortly thereafter began purchasing Ferro stock. The CC-2 Brokerage Account continued to buy Ferro stock up through on or about March 11, 2016 at approximately 11:37 p.m. The Peltz IP address was used to access the CC-2 Brokerage Account before each of these Ferro securities purchases.

  25.  On or about February 26, 2016, at approximately 10:27 a.m., the CC-3 Brokerage Account made its first purchase of Ferro stock. The CC-3 Brokerage Account continued to buy Ferro stock up through approximately 9:37 a.m. on or about March 15, 2016. The Peltz IP address was used to access the CC-3 Brokerage Account before each of these Ferro securities purchases.

    2.  **PELTZ Tipped Other Traders**

  26.  On or about February 22, 2016, CC-5 and CC-6 began purchasing Ferro stock in brokerage accounts in their names. The defendant JASON PELTZ and CC-5 had phone contact just minutes before the first trades.

  27.  On or about February 23, 2016, a brokerage account in the name of CC-2's Partner began buying Ferro securities. CC-2 had authorization to trade in that account. CC-2 and the defendant JASON PELTZ had multiple phone contacts on or about February 22 and 23, 2016.

28. On or about February 23, 2016, a brokerage account in the name of CC-7's father began purchasing Ferro stock. CC-7 and the defendant JASON PELTZ had an 8-minute long call on or about February 22, 2016.

29. On or about February 29, 2016, the CC-4 Brokerage Account began purchasing Ferro call options. CC-4 and the defendant JASON PELTZ had several telephone contacts in or about February 2016, including an approximately 10-minute phone call between PELTZ and a phone number associated with CC-4's employer the day before the CC-4 Brokerage Account began purchasing call options.

### E. The Co-Conspirators Sell Ferro for a Profit Following Public Announcement of the Takeover Bid

30. On or about March 15, 2016, at approximately 9:43 a.m., Bloomberg published an article stating, in sum and substance and in part, that Ferro was rumored to have received a takeover offer (the "Ferro Announcement"). The closing price of Ferro stock at the end of March 15, 2016 was approximately 4.7% higher than the closing price on March 14, 2016.

31. Following the Ferro Announcement, the accounts in which the defendant JASON PELTZ and his co-conspirators traded sold shares of Ferro for substantial profit. In total, the seven accounts linked to PELTZ and his co-conspirators made approximately $1 million in illicit profits.

### F. Benefits to PELTZ and CC-1 Following the Ferro Tip

32. Shortly following the sales in Ferro by the defendant JASON PELTZ and his co-conspirators, CC-3 made a payment to CC-1, and CC-2 made two payments to PELTZ. Specifically:

    a.  On or about March 31, 2016, a bank account for an entity controlled by CC-3 wired approximately $1 million to a bank account for an entity controlled by CC-1.

    b.  On or about March 30, 2016, CC-2 wired $39,000 to a bank account for an entity co-owned by the defendant JASON PELTZ. The next day, CC-2 wired $60,000 to the same entity.

### IV. Conclusion

  WHEREFORE, your deponent respectfully requests that the defendant JASON PELTZ be dealt with according to law.

  Because public filing of this document could result in a risk of flight by the defendant JASON PELTZ, as well as jeopardize the government's ongoing investigation, your deponent respectfully requests that this complaint, as well as any arrest warrant issued in connection with this complaint, be filed under seal.

                _/s/ Matthew Mahaffey_
                Matthew Mahaffey
                Special Agent, Federal Bureau of Investigation

Sworn to before me this ✓ by telephone and signature was authenticated
18th day of December, 2020

_Lois Bloom_
THE HONORABLE LOIS BLOOM
UNITED STATES MAGISTRATE JUDGE
EASTERN DISTRICT OF NEW YORK

AO 442 (Rev. 11/11) Arrest Warrant

# UNITED STATES DISTRICT COURT
for the

Eastern District of New York

| United States of America | ) |
|---|---|
| v. | ) |
| | ) Case No. 20-M-1238 |
| JASON PELTZ, | ) |
| | ) |
| | ) |
| *Defendant* | ) |

## ARREST WARRANT

To: Any authorized law enforcement officer

**YOU ARE COMMANDED** to arrest and bring before a United States magistrate judge without unnecessary delay

*(name of person to be arrested)* JASON PELTZ ,
who is accused of an offense or violation based on the following document filed with the court:

☐ Indictment  ☐ Superseding Indictment  ☐ Information  ☐ Superseding Information  ☑ Complaint
☐ Probation Violation Petition  ☐ Supervised Release Violation Petition  ☐ Violation Notice  ☐ Order of the Court

This offense is briefly described as follows:

Securities fraud in violation of Title 15, United States Code, Sections 78j(b) and 78ff.

Date: 12/18/2020

*Lois Bloom*

*Issuing officer's signature*

City and state: Brooklyn, New York

The Honorable Lois Bloom, USMJ

*Printed name and title*

**Return**

This warrant was received on *(date)* _____ , and the person was arrested on *(date)* _____
at *(city and state)* _____ .

Date: _____

*Arresting officer's signature*

*Printed name and title*

**This second page contains personal identifiers provided for law-enforcement use only and therefore should not be filed in court with the executed warrant unless under seal.**

*(Not for Public Disclosure)*

Name of defendant/offender: _____

Known aliases: _____

Last known residence: _____

Prior addresses to which defendant/offender may still have ties: _____

Last known employment: _____

Last known telephone numbers: _____

Place of birth: _____

Date of birth: _____

Social Security number: _____

Height: _____     Weight: _____

Sex: _____     Race: _____

Hair: _____     Eyes: _____

Scars, tattoos, other distinguishing marks: _____

History of violence, weapons, drug use: _____

Known family, friends, and other associates *(name, relation, address, phone number)*: _____

FBI number: _____

Complete description of auto: _____

Investigative agency and address: _____

Name and telephone numbers (office and cell) of pretrial services or probation officer *(if applicable)*: _____

Date of last contact with pretrial services or probation officer *(if applicable)*: _____

Print     Save As...     Reset