AES:KTF/SME
F. #2016R01900

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - X

UNITED STATES OF AMERICA

    - against -

JASON PELTZ,

           Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - - - X

**\*\*\*FILED\*\*\***

3:52 pm, Mar 23, 2021

**U.S. DISTRICT COURT**

**EASTERN DISTRICT OF NEW YORK**

I N D I C T M E N T
Cr. No. **1:21-cr-00154 (NGG)(RLM)**
(T. 15, U.S.C., §§ 78j and 78ff; T. 18,
U.S.C., §§ 371, 982(a)(1), 981(a)(1)(C),
982(b)(1), 1001(a)(2), 1348, 1349,
1956(h), 1957(a), 1957(b), 2 and 3551 et
seq.; T. 21, U.S.C., 853(p); T. 26,
U.S.C., § 7201; T. 28, U.S.C., § 2461(c))

THE GRAND JURY CHARGES:

## INTRODUCTION

At all times relevant to this Indictment, unless otherwise stated:

I.    The Defendant, Co-Conspirators and Other Individuals

      1.     The defendant JASON PELTZ was a resident of Brooklyn, New York,

who previously resided in Queens, New York. PELTZ was previously employed as a principal

at a purported financial services firm (the "Peltz Financial Firm"), and as the co-founder and

Chief Executive Officer ("CEO") of a purported mobile application start-up company (the "Peltz

Start-Up").

      2.     Co-Conspirator 1 ("CC-1"), an individual whose identity is known to the

Grand Jury, was a resident of New York, New York. CC-1 was the Chairman, CEO and

Managing Member of an investment firm specializing in specialty chemicals and performance

materials (the "CC-1 Investment Firm"). During the relevant time period, CC-1 served on the

Board of Directors of Ferro Corporation ("Ferro").

3.     CC-1's spouse ("CC-1's Spouse"), an individual whose identity is known to the Grand Jury, was a close friend of the defendant JASON PELTZ.

4.     Co-Conspirator 2 ("CC-2"), an individual whose identity is known to the Grand Jury, was a resident of Oyster Bay, New York.   During the relevant time period, CC-2 held a brokerage account at a brokerage firm (the "Brokerage Firm") that was created on or about November 3, 2015 (the "CC-2 Brokerage Account").

5.     CC-2's domestic partner ("CC-2's Partner"), an individual whose identity is known to the Grand Jury, resided with CC-2.   CC-2 controlled a brokerage account in CC-2's Partner's name (the "CC-2's Partner Brokerage Account").

6.     Co-Conspirator 3 ("CC-3"), an individual whose identity is known to the Grand Jury, was a resident of Dubai, United Arab Emirates.   During the relevant time period, CC-3 held a brokerage account that was created at the Brokerage Firm on or about November 13, 2015 in the name of a corporate entity (the "CC-3 Brokerage Account").

7.     Co-Conspirator 4 ("CC-4"), an individual whose identity is known to the Grand Jury, was a resident of Cold Spring Harbor, New York.   CC-4 was the Chief Financial Officer of a real estate company based in Long Island, New York, and a relative of the defendant JASON PELTZ.

8.     Co-Conspirator 5 ("CC-5") and Co-Conspirator 5's spouse ("CC-5's Spouse"), individuals whose identities are known to the Grand Jury, were a married couple who resided in Long Island City, New York.

9.     Co-Conspirator 6 ("CC-6"), an individual whose identity is known to the Grand Jury, resided in the New York City area and was an employee of the Peltz Start-Up.

10.    The Reporter, an individual whose identity is known to the Grand Jury, was a reporter at a financial news organization.

11.    Individual 1, an individual whose identity is known to the Grand Jury, was a longtime friend of the defendant JASON PELTZ, and served as PELTZ's partner in the Peltz Financial Firm.

12.    Individual 2, an individual whose identity is known to the Grand Jury, had a relationship with the defendant JASON PELTZ during the relevant time period.   Individual 2 had a corporate credit card (the "Corporate Credit Card") on which PELTZ was an authorized user.

II.    Relevant Entities

13.    Community Health Systems was a company that provided general hospital healthcare services and had its principal place of business in Franklin, Tennessee.   Shares of Community Health Systems traded on the New York Stock Exchange ("NYSE") under the ticker symbol "CYH."

14.    Ferro was a company that made chemicals for the manufacturing industry with its principal place of business in Mayfield Heights, Ohio.   Shares of Ferro traded on the NYSE under the ticker symbol "FOE."

15.    INC Research Holdings was a medical testing company with its principal place of business in Raleigh, North Carolina.   Shares of INC Research Holdings traded on the NASDAQ Stock Market ("NASDAQ") under the ticker symbol "INCR."

16.    Medivation was a biopharmaceutical company headquartered in San Francisco, California.   Shares of Medivation traded on the NASDAQ under the ticker symbol MDVN.

17.     R.R. Donnelley was an integrated communications company headquartered in Chicago, Illinois that provided marketing and business communications. Shares of R.R. Donnelley traded on the NYSE under the ticker symbol "RRD."

III.    Relevant Regulatory Principles and Definitions

18.     An "issuer" was a legal entity that developed, registered and sold securities to finance its operations.   Issuers could be companies, corporations, investment trusts or domestic or foreign governments.   Issuers were legally responsible for the obligations of the securities and for reporting financial conditions, material developments and any other operational activities as required by the regulations of their jurisdictions.   Issuers made available different types of securities, including preferred stocks, bonds and options.

19.     A "stock" was a type of security that signified proportionate ownership in the issuing corporation.   This entitled the stockholder to that proportion of the corporation's assets and earnings.

20.     An "option contract," commonly referred to as an "option," was an agreement between two parties to facilitate a potential transaction on the underlying security at a preset price, referred to as the strike price, prior to the expiration date.   Two types of option contracts were "put" and "call" options, both of which could be purchased to speculate on the direction of stocks or stock indices or sold to generate income.   For stock options, a single contract covered 100 shares of the underlying stock.

21.     A "call option" gave the holder of the option the right, but not the obligation, to purchase a specified amount of the underlying security at a specified price within a specific time period.   Generally, the holder of a call option anticipated that the price of the underlying security would increase during a specified amount of time.

22.     A "brokerage account" was an arrangement where an investor deposited money with a licensed brokerage firm, which placed trades on behalf of the customer.  Although the brokerage executed the orders, the assets belonged to the investors.

23.     An "Internet Protocol" address ("IP address") was a numerical label assigned to each device (e.g., computer, printer) participating in a computer network that used the Internet Protocol for communication.  An IP address served two principal functions: host or network interface identification and location addressing.  Because every device that connected to the internet used an IP address, IP address information could identify computers and other devices that were used to access the internet.

IV.     The Fraudulent Scheme

A.     Overview

24.     In or about and between November 2015 and October 2020, the defendant JASON PELTZ and others engaged in a fraudulent scheme in which he obtained material nonpublic information about publicly traded companies from a variety of sources, which material nonpublic information PELTZ and his co-conspirators misappropriated for their personal use.

25.     At various points during the conspiracy, the brokerage accounts of CC-2, CC-3, CC-4, CC-5, CC-5's Spouse and CC-6 made purchases of certain companies' stock shortly before news broke of significant corporate events, such as mergers or acquisitions, that often resulted in near-immediate increases in the companies' share prices.  Generally, the co-conspirators' brokerage accounts sold the shares at a profit at a later date, in close proximity to the relevant corporate events or the public announcements of those events.

26.     The defendant JASON PELTZ cultivated multiple sources from which he received material nonpublic information.  PELTZ and his co-conspirators used the material

nonpublic information to profitably trade in securities in advance of the public disclosure of that material nonpublic information through news articles.   PELTZ and certain co-conspirators received personal benefits, including direct financial remuneration, in exchange for providing and passing on the material nonpublic information on which the co-conspirators traded.

27.     The defendant JASON PELTZ sought to cultivate relationships with reporters at financial publications to gain access to information known to the reporters, including information regarding upcoming news articles about companies.

28.     To prevent scrutiny of his communications, the defendant JASON PELTZ obtained and communicated using prepaid cellular telephones, known as "burner" phones, and also communicated via the use of smartphone applications with end-to-end encryption.

      B.     The Defendant's Use of the CC-2 and CC-3 Brokerage Accounts

29.     To conceal securities transactions made in furtherance of the scheme and to ensure such transactions could not be traced to him, the defendant JASON PELTZ used the CC-2 and CC-3 Brokerage Accounts to make certain illegal trades.   The CC-2 and CC-3 Brokerage Accounts were created within ten days of each other in November 2015.

30.     The defendant JASON PELTZ typically logged into the CC-2 and CC-3 Brokerage Accounts using an IP address ending in .54 that traced back to PELTZ's residence (the "Peltz IP Address").   The Peltz IP address was registered in the name of Individual 1.

31.     In addition to logging into the CC-2 and CC-3 Brokerage Accounts online, the defendant JASON PELTZ participated in telephone calls to the Brokerage Firm regarding the CC-2 and CC-3 Brokerage Accounts, which were recorded by the Brokerage Firm.   These calls included the following:

(a)     On or about November 24, 2015, an iPhone subscribed to by PELTZ with an assigned telephone number ending in -3202 (the "Peltz iPhone") called the Brokerage Firm regarding the CC-2 Brokerage Account.   During the call with a representative from the Brokerage Firm, PELTZ and another individual spoke on behalf of the accountholder. Both PELTZ and the other individual discussed with the Brokerage Firm representative the subject of accessing live data feed information for the CC-2 Brokerage Account.

(b)     On or about February 4, 2016, a man who identified himself as CC-3 called the Brokerage Firm in reference to the CC-3 Brokerage Account.   During the ensuing conversation, CC-3 can be heard consulting with PELTZ.

32.     Although the Peltz IP address was registered in Individual 1's name, the defendant JASON PELTZ expressed concern that the trading in the CC-2 and CC-3 Brokerage Accounts could nevertheless be traced back to him through the Peltz IP Address.   In or about the spring of 2016, following the Ferro trades described below, PELTZ visited an apartment near Queens Boulevard in Queens, New York (the "Queens Boulevard Apartment") for the purposes of relocating PELTZ's trading operation.

V.    The Ferro Scheme

    A.    Overview

        33.    In or about February 2016, the defendant JASON PELTZ obtained material nonpublic information via a Ferro insider about a likely takeover offer (the "Ferro Takeover Bid").   PELTZ used that material nonpublic information to (1) profitably trade in Ferro in advance of any public announcement of the Ferro Takeover Bid in the CC-2 and CC-3 Brokerage Accounts, (2) tip CC-4, CC-5 and CC-6, each of whom also profitably traded on material nonpublic information about the Ferro Takeover Bid, and (3) tip the Reporter, who wrote an article making public the news of the Ferro Takeover Bid, which resulted in an increase in the price of Ferro's stock.   PELTZ and CC-1 each received large financial benefits from certain co-conspirators shortly after PELTZ traded on the material nonpublic information about the Ferro Takeover Bid in those co-conspirators' brokerage accounts.

    B.    The Ferro Takeover Bid

        34.    On or about February 17, 2016, Ferro held a Board of Directors meeting at which the Ferro Takeover Bid was discussed in confidence (the "Ferro Board Meeting").   CC-1 was in attendance at the Ferro Board Meeting.

        35.    On or about March 15, 2016 at approximately 9:43 a.m., an article written by the Reporter was published stating, in sum and substance and in part, that Ferro was rumored to have received a takeover offer (the "Ferro Announcement").   The Ferro Announcement represented the first time that information about the Ferro Takeover Bid was made public.

C.    The Defendant's Relationship with CC-1 and CC-1's Spouse

36.    The defendant JASON PELTZ maintained a close relationship with both CC-1 and CC-1's Spouse.   CC-1's Spouse was one of PELTZ's most frequent contacts on the Peltz iPhone.   PELTZ invested money with CC-1 and referred wealthy associates of his to invest with CC-1.   PELTZ also represented CC-1 in discussions with CC-4 in or about March 2016 regarding the potential sale-leaseback of CC-1's luxury residence in New York, New York. PELTZ attended CC-1's and CC-1's Spouse's wedding in the British Virgin Islands on or about March 16, 2016, approximately one day after the Ferro Announcement.

37.    The defendant JASON PELTZ, CC-1 and CC-1's Spouse were in close contact in the weeks prior to the Ferro Announcement on or about March 15, 2016.   These contacts included the following:

(a)    On or about February 17, 2016, following the Ferro Board Meeting, CC-1 had an approximately 23-minute phone conversation with CC-1's Spouse.   CC-1 and CC-1's Spouse had additional phone contact with each other in the following days.

(b)    PELTZ called and texted with CC-1 and CC-1's Spouse dozens of times in the two weeks following the Ferro Board Meeting.

(c)    PELTZ and CC-1's Spouse had numerous phone contacts on or about the evening of February 21, 2016.

38.    In addition, the defendant JASON PELTZ took an Uber to the block on which CC-1 and CC-1's Spouse lived on or about March 13, 2016, two days before the Ferro Announcement.

D.      The Defendant's Illegal Trading Activity in Ferro

39.      On or about February 22, 2016—the morning immediately following the phone contact between CC-1's Spouse and the defendant JASON PELTZ described above—at approximately 9:34 a.m., shortly after the markets opened, PELTZ began purchasing Ferro stock in the CC-2 Brokerage Account.   PELTZ continued to buy Ferro stock in the CC-2 Brokerage Account up through on or about March 11, 2016 at approximately 11:37 a.m.

40.      On or about February 26, 2016 at approximately 10:27 a.m., the defendant JASON PELTZ made the first purchase of Ferro stock in the CC-3 Brokerage Account.   PELTZ continued to buy Ferro stock in the CC-3 Brokerage Account up through on or about March 15, 2016 at approximately 9:37 a.m.

E.      The Defendant's Illegal Tips to Co-Conspirators

41.      On or about February 22, 2016, the defendant JASON PELTZ and CC-5 were in contact by phone.   Just minutes after that phone contact, brokerage accounts in the names of CC-5 and CC-5's Spouse began purchasing Ferro securities.

42.      On or about February 22, 2016 and February 23, 2016, the defendant JASON PELTZ and CC-2 had multiple phone contacts.   On or about February 23, 2016, the CC-2's Partner Brokerage Account began buying Ferro securities.

43.      On or about February 22, 2016, the defendant JASON PELTZ had a call with CC-6 that lasted approximately eight minutes.   On or about February 23, 2016, a brokerage account in the name of a relative of CC-6 began purchasing Ferro securities.

44.      In or about February 2016, the defendant JASON PELTZ and CC-4 had several telephone contacts, including an approximately 10-minute phone call between PELTZ

and a phone number associated with CC-4's employer on or about February 28, 2016. On or about February 29, 2016, the CC-4 Brokerage Account began purchasing Ferro call options.

      F.     The Defendant's Contacts with the Reporter

      45.     In or about March 2016, after the defendant JASON PELTZ and his co-conspirators began purchasing Ferro securities and call options, PELTZ had numerous contacts with the Reporter. PELTZ communicated with the Reporter by phone, and generally used a burner phone (rather than the Peltz iPhone) for those contacts. PELTZ also met with the Reporter in person.

      46.     As described above, following the defendant JASON PELTZ's contacts with the Reporter, the Reporter published the Ferro Announcement on or about March 15, 2016.

      G.     The Defendant and Co-Conspirators Profited from Their Illegal Trading

      47.     At the end of the trading day on or about March 15, 2016, following the Ferro Announcement, the closing price of Ferro stock was approximately 4.7% higher than the closing price on or about March 14, 2016.

      48.     The defendant JASON PELTZ and his co-conspirators made substantial profits by selling shares of Ferro after the Ferro Announcement.

      H.     Co-Conspirators Transferred Money to the Defendant and CC-1

      49.     Shortly following the sales in Ferro by the defendant JASON PELTZ and his co-conspirators, CC-3 transferred money to CC-1, and CC-2 transferred money to PELTZ. Specifically:

      (a)     On or about March 31, 2016, a bank account for an entity controlled by CC-3 and CC-3's spouse (the "CC-3 Dubai Bank Account") wired approximately $1 million to a bank account for an entity controlled by CC-1 (the "CC-1 Entity Bank Account")

in connection with a purported investment by CC-3 in a limited liability company controlled by CC-1.

(b) On or about March 30, 2016 and March 31, 2016, CC-2 made two transfers totaling approximately $99,000 to a bank account for an entity co-owned by PELTZ ("Account 1"). In addition, on or about April 28, 2016, CC-2 transferred $50,000 to a different bank account ("Account 2"), as directed by PELTZ. On or about May 10, 2016, $33,000 of the $50,000 transfer from CC-2 was wired from Account 2 to Account 1. On or about May 27, 2016, $17,000 was wired to Account 1 from a separate account in the name of the holder of Account 2.

50. The source of funds for the payment from CC-3 to CC-1 on or about March 31, 2016 was the CC-3 Brokerage Account. Rather than transfer money directly from the CC-3 Brokerage Account to CC-1, a Ferro insider, CC-3 wired the money from the CC-3 Brokerage Account to the CC-3 Dubai Bank Account, before subsequently wiring the money to the CC-1 Entity Bank Account. Specifically:

(a) On or about March 30, 2016, an email account associated with CC-3 sent an email to the Brokerage Firm requesting a $1 million same-day wire transfer from the CC-3 Brokerage Account to the CC-3 Dubai Bank Account. The Brokerage Firm wired $1 million to the CC-3 Dubai Bank Account on or about March 30, 2016.

(b) The next day, on or about March 31, 2016, CC-3's spouse sent a letter to the bank holding the CC-3 Dubai Bank Account. The letter requested a same-day wire transfer of approximately $1 million to the CC-1 Entity Bank Account (the "Wire Transfer Letter").

51.     A photograph of the Wire Transfer Letter was later found on a mobile phone belonging to the defendant JASON PELTZ.

VI.     Additional Trades by the Defendant In Connection with the Reporter's Articles

52.     Beginning in or about March 2016, as described above, the defendant JASON PELTZ frequently spoke with the Reporter.   During these conversations, PELTZ obtained from the Reporter material nonpublic information about the Reporter's forthcoming articles regarding certain companies.   PELTZ used this material nonpublic information to trade in certain companies' stocks just prior to the publication of an article about each respective company written by the Reporter.

A.     The Medivation Trades

53.     On or about March 24, 2016, the CC-3 Brokerage Account made its first purchases of Medivation stock.   On or about March 29, 2016, the CC-2 Brokerage Account made its first purchases of Medivation stock.   Both the CC-2 and CC-3 Brokerage Accounts continued purchasing Medivation stock until approximately 2:30 p.m. on or about March 30, 2016.

54.     On or about March 30, 2016 at approximately 4:22 p.m., an article written by the Reporter was published saying, in sum and substance and in part, that Medivation had hired defense advisors after the company had received preliminary interest from potential buyers.

55.     Minutes later, both the CC-2 and CC-3 Brokerage Accounts began selling off their entire equity positions in Medivation stock.   Both the CC-2 and CC-3 Brokerage Accounts had entirely liquidated their equity positions by on or about March 31, 2016.

B.    The INC Research Trades

56.    On or about April 15, 2016, both the CC-2 and CC-3 Brokerage Accounts made their first purchases of INC Research Holdings stock.   On the next trading day, on or about April 18, 2016, before approximately 1:10 p.m., both the CC-2 and CC-3 Brokerage Accounts made additional purchases of INC Research Holdings stock.

57.    On or about April 18, 2016 at approximately 1:10 p.m., an article written by the Reporter was published stating, in sum and substance and in part, that the company Labcorp was rumored to have had discussions with INC Research Holdings about an acquisition.

58.    Starting approximately one minute later, at or about 1:11 p.m. that day, both the CC-2 and CC-3 Brokerage Accounts began selling off their entire positions in INC Research Holdings stock.

C.    The R.R. Donnelley Trades

59.    On or about July 11, 2016 at approximately 1:09 p.m., the CC-2 Brokerage Account made its first purchases of R.R. Donnelley stock, and its last purchases were at approximately 3:48 p.m. that same day.

60.    After the close of trading that day, at approximately 4:35 p.m., an article written by the Reporter was published stating Xerox Corporation ("Xerox") and R.R. Donnelley were in merger discussions (the "Xerox Article").

61.    On or about July 15, 2016, the CC-2 Brokerage Account began selling R.R. Donnelley shares.

15

D.    The Community Health Systems Trades

62.    On or about September 14, 2016, the CC-2 and CC-3 Brokerage Accounts made their first purchases of Community Health Systems stock at approximately 3:36 p.m. and 10:06 a.m., respectively.

63.    On or about September 16, 2016 at approximately 3:51 p.m., an article written by the Reporter was published stating, in sum and substance, that Community Health Systems was exploring options including a sale.

64.    That same day, shortly after the article was published, both the CC-2 and CC-3 Brokerage Accounts began to sell their positions in Community Health Systems stock. The CC-3 Brokerage Account sold off its entire position that day, while the CC-2 Brokerage Account continued to trade in Community Health Systems equities through on or about September 28, 2016.

VII.    The Defendant's Tax Evasion

65.    During the course of the conspiracy, the defendant JASON PELTZ attempted to evade payment of approximately $1 million in outstanding income tax liabilities, penalties and interest that were due and owing to the United States of America for tax years 2005 through 2009 and 2013 through 2015.

66.    The defendant JASON PELTZ entered into an Offer in Compromise ("OIC") with the Internal Revenue Service ("IRS") in or about May 2018, for approximately $25,000—a small fraction of the back taxes that PELTZ owed.  In seeking the OIC, PELTZ swore under penalty of perjury in a document dated August 4, 2017 and submitted to the IRS that he had been unemployed since December 1, 2015, and further elaborated in a handwritten note appended to the document that "i have no income since december 1st, 2015."

67.    As set forth above, however, in or about 2016 and 2017, the defendant

JASON PELTZ had received large payments from his co-conspirators and others, as well as

other benefits, for his trading activity.  PELTZ concealed transfers of money he received for

trading and other work on behalf of CC-2, CC-3 and others in corporate and nominee bank and

credit card accounts, including:

(a)    The wire transfers on or about March 30, 2016, March 31, 2016

and April 28, 2016 from CC-2 described above.

(b)    On or about February 27, 2017, a wire transfer of approximately

$35,000 from an account in the name of CC-3's spouse to the Corporate Credit Card.

68.    Following the OIC, the defendant JASON PELTZ continued to conceal

payments for his trading activity and other work in nominee bank and credit card accounts

including:

(a)    On or about May 29, 2018, a transfer of approximately $100,000

from an entity controlled by CC-3 to a bank account in the same name as the Corporate Credit

Card ("Account 3").

(b)    In or about and between August 2018 and September 2018,

transfers totaling approximately $90,000 from an individual whom PELTZ identified as his

client to the Corporate Credit Card.

VIII.    The Defendant's Statements to the FBI

69.    On or about October 28, 2020, agents from the Federal Bureau of

Investigation ("FBI") approached the defendant JASON PELTZ and conducted a voluntary

interview of him.  During the interview, PELTZ stated the following, in sum and substance and

in part:

(a)     PELTZ denied knowing at what financial institution CC-2 had a

brokerage account.   PELTZ insisted that CC-2 had set up his own brokerage account, and the

account was only used by CC-2.   PELTZ also stated that he never called the Brokerage Firm in

connection with CC-2's brokerage account.

(b)     Regarding information on which he traded, PELTZ stated that he

worked with a group of people who had "access" and that PELTZ was on the periphery of

something that went to a "very high level."   PELTZ described the group as "a group of global

pirates."   PELTZ denied that CC-3 was involved in the group.

(c)     PELTZ indicated that he had two burner phones in his bag and

stated that if the FBI seized those two burner phones, it was going to "blow everything up."

(d)     PELTZ admitted that he received a $50,000 to $100,000 share of

CC-3's trading profits in or about 2016 through 2017 for PELTZ's trading on behalf of CC-3.

(e)     PELTZ admitted that he earned between $80,000 and $100,000 per

year after he ceased working on the Peltz Start-Up.

## COUNT ONE
(Conspiracy to Commit Securities Fraud)

70.     The allegations contained in paragraphs one through 69 are realleged and

incorporated as if fully set forth in this paragraph.

71.     In or about and between November 2015 and October 2020, both dates

being approximate and inclusive, within the Eastern District of New York and elsewhere, the

defendant JASON PELTZ, together with others, did knowingly and willfully conspire to use and

employ one or more manipulative and deceptive devices and contrivances, contrary to Rule 10b-

5 of the Rules and Regulations of the United States Securities and Exchange Commission

("SEC"), Title 17, Code of Federal Regulations, Section 240.10b-5, by: (a) employing one or

more devices, schemes and artifices to defraud; (b) making one or more untrue statements of material fact and omitting to state one or more material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and (c) engaging in one or more acts, practices and courses of business which would and did operate as a fraud and deceit upon investors and potential investors in Ferro, Medivation, R.R. Donnelley, INC Research Holdings and Community Health Systems (the "Traded Companies"), in connection with the purchase and sale of securities in the Traded Companies, directly and indirectly, by use of means and instrumentalities of interstate commerce and the mails, contrary to Title 15, United States Code, Sections 78j(b) and 78ff.

72.     In furtherance of the conspiracy and to effect its objects, within the Eastern District of New York and elsewhere, the defendant JASON PELTZ, together with others, did commit and caused the commission of, among others, the following:

## OVERT ACTS

(a)     On or about February 22, 2016 at approximately 9:08 a.m., PELTZ began purchasing Ferro stock in the CC-2 Brokerage Account.

(b)     On or about February 26, 2016 at approximately 10:27 a.m., PELTZ made the first purchase of Ferro stock in the CC-3 Brokerage Account.

(c)     In or about March 2016, PELTZ contacted the Reporter for the purpose of providing the Reporter material nonpublic information about the Ferro Takeover Bid.

(d)     On or about March 31, 2016, the CC-3 Dubai Bank Account wired approximately $1 million to the CC-1 Entity Bank Account.

(e)     On or about March 30, 2016, CC-2 wired $39,000 to Account 1.

(f)     On or about March 31, 2016, CC-2 wired $60,000 to Account 1.

(g)     On or about April 28, 2016, CC-2 wired $50,000 to Account 2.

(h)     In or about the spring of 2016, following the Ferro trades described above, PELTZ toured the Queens Boulevard Apartment for the purposes of relocating PELTZ's trading operation.

(i)     On or about July 11, 2016, the CC-2 Brokerage Account purchased R.R. Donnelley securities shortly before an article by the Reporter was published about a potential merger between R.R. Donnelley and Xerox.

(j)     On or about February 27, 2017, CC-3's spouse sent a wire transfer of approximately $35,000 to the Corporate Credit Card.

(k)     On or about May 29, 2018, an entity controlled by CC-3 transferred approximately $100,000 to Account 3.

(l)     On or about October 28, 2020, PELTZ falsely stated to FBI agents that he did not know where CC-2 had a trading account.

(Title 18, United States Code, Sections 371, 2 and 3551 et seq.)

COUNT TWO
(Securities Fraud – Insider Trading in Ferro)

73.     The allegations contained in paragraphs one through 68 are realleged and incorporated as if fully set forth in this paragraph.

74.     In or about and between February 2016 and March 2016, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendant JASON PELTZ, together with others, did knowingly and willfully use and employ one or more manipulative and deceptive devices and contrivances, contrary to Rule 10b-5 of the Rules and Regulations of the SEC, Title 17, Code of Federal Regulations, Section 240.10b-5, by: (a) employing one or more devices, schemes and artifices to defraud; (b) making one or more untrue

statements of material fact and omitting to state one or more material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and (c) engaging in one or more acts, practices and courses of businesses which would and did operate as a fraud and deceit upon persons, to wit: on the basis of material nonpublic information that PELTZ obtained via an insider at issuer Ferro, PELTZ executed or caused to be executed transactions in the securities of Ferro, directly and indirectly, by use of means and instrumentalities of interstate commerce and the mails.

(Title 15, United States Code, Sections 78j(b) and 78ff; Title 18, United States Code, Sections 2 and 3551 et seq.)

## COUNT THREE
(Conspiracy to Commit Securities Fraud)

75. The allegations contained in paragraphs one through 69 are realleged and incorporated as if fully set forth in this paragraph.

76. In or about and between November 2015 and October 2020, in the Eastern District of New York and elsewhere, the defendant JASON PELTZ, together with others, did knowingly and intentionally conspire to execute a scheme and artifice to (a) defraud persons in connection with securities of an issuer with a class of securities registered under Section 12 of the Securities Exchange Act of 1934 and that was required to file reports under Section 15(d) of the Securities Exchange Act of 1934, and (b) obtain, by means of one or more false and fraudulent pretenses, representations and promises, money and property in connection with the purchase and sale of securities of an issuer with a class of securities registered under Section 12 of the Securities Exchange Act of 1934 and that was required to file reports under Section 15(d) of the Securities Exchange Act of 1934, to wit: PELTZ schemed to defraud the shareholders of the Traded Companies by improperly obtaining material nonpublic information about the Traded

Companies through deceptive means and then converting that information to his own use for the

purpose of executing securities transactions in the stock of the Traded Companies, contrary to

Title 18, United States Code, Section 1348.

(Title 18, United States Code, Sections 1349 and 3551 et seq.)

COUNT FOUR
(Securities Fraud – Insider Trading in Ferro)

77.     The allegations contained in paragraphs one through 69 are realleged and

incorporated as if fully set forth in this paragraph.

78.     In or about and between February 2016 and March 2016, in the Eastern

District of New York and elsewhere, the defendant JASON PELTZ, together with others,

knowingly and intentionally executed a scheme and artifice to (a) defraud persons in connection

with securities of an issuer with a class of securities registered under Section 12 of the Securities

Exchange Act of 1934 and that was required to file reports under Section 15(d) of the Securities

Exchange Act of 1934, and (b) obtain, by means of one or more false and fraudulent pretenses,

representations and promises, money and property in connection with the purchase and sale of

securities of an issuer with a class of securities registered under Section 12 of the Securities

Exchange Act of 1934 and that was required to file reports under Section 15(d) of the Securities

Exchange Act of 1934, to wit: PELTZ schemed to defraud the shareholders of issuer Ferro by

improperly obtaining material nonpublic information about Ferro through deceptive means and

then converting that information to his own use for the purpose of executing one or more

securities transactions in Ferro stock.

(Title 18, United States Code, Sections 1348, 2 and 3551 et seq.)

## COUNT FIVE
(Conspiracy to Commit Money Laundering)

79.     The allegations contained in paragraphs one through 69 are realleged and incorporated as if fully set forth in this paragraph.

80.     In or about and between November 2015 and October 2020, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendant JASON PELTZ, together with others, did knowingly and intentionally conspire to engage in one or more monetary transactions, to wit: deposits, withdrawals and transfers of funds and monetary instruments, in and affecting interstate commerce, by, through and to one or more financial institutions, in criminally derived property that was of a value greater than $10,000 and that was derived from one or more specified unlawful activities, to wit: fraud in the sale of securities, contrary to Title 15, United States Code, Sections 78j(b) and 78ff and Title 18, United States Code, Section 1348, and conspiracy to commit securities fraud, contrary to Title 18, United States Code, Sections 371 and 1349, all contrary to Title 18, United States Code, Section 1957(a).

(Title 18, United States Code, Sections 1956(h) and 3551 et seq.)

## COUNTS SIX THROUGH EIGHT
(Unlawful Monetary Transactions Over $10,000)

81.     The allegations contained in paragraphs one through 69 are realleged and incorporated as if fully set forth in this paragraph.

82.     In or about March 2016, within the Eastern District of New York and elsewhere, the defendant JASON PELTZ, together with others, did knowingly and intentionally engage in one or more monetary transactions, in and affecting interstate commerce, in criminally derived property that was of a value greater than $10,000, as set forth in the chart below, and that

was derived from one or more specified unlawful activities, to wit: fraud in the sale of securities,

contrary to Title 15, United States Code, Sections 78j(b) and 78ff and Title 18, United States

Code, Section 1348, and conspiracy to commit securities fraud, contrary to Title 18, United

States Code, Sections 371 and 1349.

| COUNT | MONETARY TRANSACTION |
|---|---|
| SIX | On or about March 30, 2016, PELTZ transferred or caused the transfer of approximately $39,000 in illicit trading proceeds from the CC-2 Brokerage Account to a bank account controlled by PELTZ with an account number ending in -9600. |
| SEVEN | On or about March 31, 2016, PELTZ transferred or caused the transfer of approximately $60,000 in illicit trading proceeds from the CC-2 Brokerage Account to a bank account controlled by PELTZ with an account number ending in -9600. |
| EIGHT | On or about April 28, 2016, PELTZ transferred or caused the transfer of approximately $50,000 in illicit trading proceeds from a bank account controlled by CC-2 with an account number ending in -4129 to a bank account with an account number ending in -4308. |

(Title 18, United States Code, Sections 1957(a), 1957(b), 2 and 3551 et seq.)

## COUNT NINE
(False Statements to the FBI)

83.     The allegations contained in paragraphs one through 69 are realleged and

incorporated as if fully set forth in this paragraph.

84.     On or about October 28, 2020, within the Eastern District of New York

and elsewhere, the defendant JASON PELTZ did knowingly and willfully make one or more

materially false, fictitious and fraudulent statements and representations, in a matter within the

jurisdiction of the executive branch of the Government of the United States, to wit: the FBI, in

that the defendant falsely stated and represented to FBI Special Agents that he did not know at

which brokerage firm CC-2 had a trading account; that CC-2 had set up his own trading account;

and that CC-2's Brokerage Account was CC-2's "only," all of which were statements that the defendant well knew were false.

(Title 18, United States Code, Sections 1001(a)(2) and 3551 et seq.)

## COUNT TEN
### (Tax Evasion)

85.     The allegations contained in paragraphs one through 69 are realleged and incorporated as if fully set forth in this paragraph.

86.     In or about and between January 2016 and May 2018, in the Eastern District of New York and elsewhere, the defendant JASON PELTZ, a resident of Brooklyn, New York and Queens, New York, willfully attempted to evade and defeat the payment of a substantial income tax due and owing by him to the United States of America, for the calendar years 2005 through 2009 and 2013 through 2015, by committing the following affirmative acts, among others:

(a)     On or about April 4, 2017, PELTZ filed and submitted to the IRS a false 2016 individual income tax return claiming that he had no income in 2016.

(b)     On or about August 4, 2017, PELTZ submitted a false Form 433-A (OIC), Collection Information Statement claiming that he was unemployed and had no income.

(c)     On or about March 30, 2016 and March 31, 2016, PELTZ received wire transfers totaling approximately $99,000 from CC-2 to Account 1.

(d)     On or about April 28, 2016, PELTZ directed the wire transfer of approximately $50,000 from CC-2 to Account 2.

(e)     On or about May 10, 2016, PELTZ received a wire transfer of approximately $33,000 from Account 2 to Account 1.

25

(f)     On or about May 27, 2016, PELTZ received to Account 1 a wire transfer of approximately $17,000 from an account in the name of the holder of Account 2.

(g)     On or about February 27, 2017, PELTZ received a wire transfer of approximately $35,000 from an account in the name of CC-3's spouse to the Corporate Credit Card.

(Title 26, United States Code, Section 7201; Title 18, United States Code, Section 3551 et seq.)

## CRIMINAL FORFEITURE ALLEGATION
## AS TO COUNTS ONE THROUGH FOUR

87.     The United States hereby gives notice to the defendant that, upon his conviction of any of the offenses charged in Counts One through Four, the government will seek forfeiture in accordance with Title 18, United States Code, Section 981(a)(1)(C) and Title 28, United States Code, Section 2461(c), which require any person convicted of such offenses to forfeit any property, real or personal, constituting, or derived from, proceeds obtained directly or indirectly as a result of such offenses.

88.     If any of the above-described forfeitable property, as a result of any act or omission of the defendant:

(a)     cannot be located upon the exercise of due diligence;

(b)     has been transferred or sold to, or deposited with, a third party;

(c)     has been placed beyond the jurisdiction of the court;

(d)     has been substantially diminished in value; or

(e)     has been commingled with other property which cannot be divided without difficulty;

it is the intent of the United States, pursuant to Title 21, United States Code, Section 853(p), to

seek forfeiture of any other property of the defendant up to the value of the forfeitable property described in this forfeiture allegation.

(Title 18, United States Code, Section 981(a)(1)(C); Title 21, United States Code, Section 853(p); Title 28, United States Code, Section 2461(c))

## CRIMINAL FORFEITURE ALLEGATION
## AS TO COUNTS FIVE THROUGH EIGHT

89.     The United States hereby gives notice to the defendant that, upon his conviction of any of the offenses charged in Counts Five through Eight, the government will seek forfeiture in accordance with Title 18, United States Code, Section 982(a)(1), which requires any person convicted of such offenses to forfeit any property, real or personal, involved in such offenses, or any property traceable to such property.

90.     If any of the above-described forfeitable property, as a result of any act or omission of the defendant:

>    (a)     cannot be located upon the exercise of due diligence;
>
>    (b)     has been transferred or sold to, or deposited with, a third party;
>
>    (c)     has been placed beyond the jurisdiction of the court;
>
>    (d)     has been substantially diminished in value; or
>
>    (e)     has been commingled with other property which cannot be divided

without difficulty;

it is the intent of the United States, pursuant to Title 21, United States Code, Section 853(p), as incorporated by Title 18, United States Code, Section 982(b)(1), to seek forfeiture of any other property of the defendant up to the value of the forfeitable property described in this forfeiture allegation.

(Title 18, United States Code, Sections 982(a)(1) and 982(b)(1); Title 21, United States Code, Section 853(p))

A TRUE BILL

FOREPERSON

MARK J. LESKO
ACTING UNITED STATES ATTORNEY
EASTERN DISTRICT OF NEW YORK

F.#: 2016R01900
FORM DBD-34
JUN. 85

No.

## UNITED STATES DISTRICT COURT

EASTERN *District of* NEW YORK

CRIMINAL DIVISION

## THE UNITED STATES OF AMERICA

*vs.*

JASON PELTZ,

Defendant.

## INDICTMENT

(T. 15, U.S.C., §§ 78j and 78ff; T. 18, U.S.C., §§ 371, 982(a)(1),
981(a)(1)(C), 982(b)(1), 1001(a)(2), 1348, 1349, 1956(h), 1957(a),
1957(b), 2 and 3551 et seq.; T. 21, U.S.C., 853(p); T. 26, U.S.C., § 7201;
T. 28, U.S.C., § 2461(c))

*A true bill.*

_____

*Foreperson*

*Filed in open court this* _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ *day,*

*of* _ _ _ _ _ _ _ _ _ _ _ _ _ *A.D. 20* _ _ _ _ _

*Clerk*

***Kaitlin T. Farrell and Sarah M. Evans, Assistant U.S. Attorneys***
***(718) 254-7000***