

U.S. Department of Justice

*United States Attorney*
*Eastern District of New York*

KTF/SME
F. #2016R01900

*271 Cadman Plaza East*
*Brooklyn, New York 11201*

October 31, 2022

By ECF

The Honorable Nicholas G. Garaufis
United States District Judge
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

   Re: United States v. Jason Peltz
     Criminal Docket No. 21-CR-154 (NGG)

Dear Judge Garaufis:

  The government respectfully submits this letter in anticipation of the defendant Jason Peltz's sentencing, which is scheduled for November 10, 2022 at 11:00 a.m. For the reasons set forth below, the government respectfully requests that the Court the defendant to a term of 36 months' incarceration, which is slightly below the applicable United States Sentencing Guidelines ("Guidelines" or "U.S.S.G.") range of 37 to 46 months. The government also requests that the Court enter an order of restitution in the amount of $1,017,353.94.

I. Procedural Background

  On March 23, 2021, a grand jury sitting in the Eastern District of New York returned a ten-count indictment (the "Indictment") charging the defendant with securities fraud, conspiracy to commit securities fraud, money laundering, money laundering conspiracy, false statements, and tax evasion. On March 29, 2022, the defendant pleaded guilty pursuant to a plea agreement to one count of securities fraud, in violation of 15 U.S.C. §§ 78j(b) and 78ff (Count Two), and one count of tax evasion, in violation of 26 U.S.C. § 7201 (Count Ten).

II. Factual Background

  The facts of this case are summarized in the Presentence Investigation Report ("PSR") dated July 12, 2022 and below.

  In February 2016, the defendant obtained material nonpublic information ("MNPI") from an insider at Ferro Corporation ("Ferro," identified by stock ticker "FOE") about a potential takeover offer (the "Ferro Takeover Bid"). The Ferro insider provided this MNPI for the purpose of the defendant trading on the information. The defendant used that MNPI to

profitably trade in Ferro stock and options in the brokerage accounts of two co-conspirators (identified in the Indictment as "CC-2" and "CC-3") and tip certain other individuals, each of whom also profitably traded on the MNPI about the Ferro Takeover Bid. The defendant had also provided the MNPI to a reporter at a financial publication (the "Reporter") in the hopes that the reporter would publish a story on the Ferro Takeover Bid. On March 15, 2016, the Reporter did so, which resulted in an increase in the price of Ferro's stock and resulted in the defendant's options being "in the money."

The defendant and the Ferro insider each received significant financial benefits from other co-conspirators soon after the defendant traded in the co-conspirators' brokerage accounts. Shortly following the sales in Ferro by the defendant, CC-3 transferred money to the Ferro insider, and CC-2 transferred money to the defendant. Specifically:

- On March 31, 2016, a bank account located in Dubai for an entity controlled by CC-3 and CC-3's spouse (the "CC-3 Dubai Bank Account") wired approximately $1 million to a bank account for an entity controlled by the Ferro insider in connection with a purported investment by CC-3 in a limited liability company controlled by the Ferro insider. The source of these funds were CC-3's brokerage account that the defendant had been trading in.

- On March 30, 2016 and March 31, 2016, CC-2 made two transfers totaling approximately $99,000 to a bank account for an entity co-owned by the defendant ("Account 1"). In addition, on or about April 28, 2016, CC-2 transferred $50,000 to a different bank account ("Account 2"), as directed by the defendant. On or about May 10, 2016, $33,000 of the $50,000 transfer from CC-2 was wired from Account 2 to Account 1. On or about May 27, 2016, $17,000 was wired to Account 1 from a separate account in the name of the holder of Account 2.

Following the Ferro trades, the defendant continued to have regular contact with the Reporter and traded in a number of stocks about which the Reporter broke stories, typically before the Reporter broke them, with mixed results. Certain of those trades are outlined in Indictment paragraphs 53 through 64.

In addition to his insider trading of Ferro stock, the defendant attempted to evade payment of approximately $1 million in outstanding income tax liabilities, penalties and interest that were due and owing to the United States of America for tax years 2005 through 2009 and 2013 through 2015. Over a decade ago, the defendant had incurred substantial tax liabilities in connection with his work as a trader. In May 2018, the defendant entered an Offer in Compromise ("OIC") with the Internal Revenue Service ("IRS") for approximately $25,000—a small fraction of the back taxes that the defendant owed. In seeking the OIC, the defendant swore under penalty of perjury in a document dated August 4, 2017 and submitted to the IRS that

he had been unemployed since December 1, 2015, and further elaborated in a handwritten note appended to the document that "i have no income since december 1st, 2015." This was false. Throughout 2016 and 2017, the defendant had received large payments from his co-conspirators and others, as well as other benefits, for his trading activity in Ferro and other stocks. The defendant concealed transfers of money he received for trading and other work on behalf of CC-2, CC-3 and others in corporate and nominee bank and credit card accounts.

During the time he was claiming poverty to the IRS, the defendant was living a luxurious lifestyle. He purchased luxury-brand watches; flew first-class to Formula One races; went yachting in the South of France; and lived in a luxury high-rise condominium, all paid for by company credit cards and nominee accounts to disguise his lifestyle from the IRS.

III.     Guidelines Calculation

Probation calculates the defendant's total Guidelines offense level as 21 (PSR ¶ 76), and his criminal history category as I (PSR ¶ 72), leading to a Guidelines range of incarceration of 37 to 46 months (PSR ¶ 119).

IV.     Consideration of Section 3553(a) Factors

For the reasons set forth below, the government respectfully submits that a sentence of 36 months—three years—is appropriate considering the factors set forth in 18 U.S.C. § 3553(a).

A. Legal Standard

In United States v. Booker, the Supreme Court held that the Guidelines are advisory and not mandatory, and the Court made clear that district courts are still "require[d] . . . to consider Guidelines ranges" in determining sentences, but also may tailor the sentence in light of other statutory concerns. 125 S. Ct. 738, 743 (2005); see 18 U.S.C. § 3553(a). Subsequent to Booker, the Second Circuit held that "sentencing judges remain under a duty with respect to the Guidelines ... to 'consider' them, along with the other factors listed in section 3553(a)." United States v. Crosby, 397 F.3d 103, 111 (2d Cir. 2005). Although the Court declined to determine what weight a sentencing judge should normally give to the Guidelines in fashioning a reasonable sentence, the Court cautioned that judges should not "return to the sentencing regime that existed before 1987 and exercise unfettered discretion to select any sentence within the applicable statutory maximum and minimum." Id. at 113.

Later, in Gall v. United States, the Supreme Court clarified the proper procedure and order of consideration for sentencing courts as follows: "[A] district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range. As a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark." 552 U.S. 38, 49 (2007) (citation omitted). Next, a sentencing court

should "consider all of the § 3553(a) factors to determine whether they support the sentence requested by a party. In so doing, [s]he may not presume that the Guidelines range is reasonable. [Sh]e must make an individualized assessment based on the facts presented." Id. at 49-50 (citation and footnote omitted).

   B.  A Sentence of 36 Months Is Appropriate in This Case

      1.  The Nature and Circumstances of the Offenses; Reflecting the Seriousness of the Offenses, Promoting Respect for the Law and Providing Just Punishment

The defendant's offenses were serious and merit a meaningful sentence. While the defendant's crimes are not violent, both crimes to which the defendant allocuted undermine the public's confidence in government and the systems that are in place to protect and support the average American.

With respect to insider trading, Congress has found that insider trading undermines the public's faith in the country's capital market system and is unfair and inconsistent with the public's expectation of a level playing field. See Insider Trading and Securities Fraud Enforcement Act of 1988, H.R. Rep. No. 100-90, at 7-8 (1988), reprinted in 1988 U.S.C.C.A.N. 6043, 6044 ("Insider trading damages the legitimacy of the capital market and diminishes the public's faith …. [T]he small investor will be—and has been—reluctant to invest in the market if he feels it is rigged against him."); H.R. Rep. No. 98-355, at 5 (1983) (emphasizing that "[t]he abuse of informational advantages that other investors cannot hope to overcome through their own efforts is unfair and inconsistent with the investing public's legitimate expectation of honest and fair securities markets where all participants play by the same rules"); Arthur Levitt, A Question of Integrity: Promoting Investor Confidence By Fighting Insider Trading, in vital Speeches of the Day, Vol. LXIV, 354, 355 (Apr. 1, 1998) ("The American people see it, bluntly, as a form of cheating.").

The defendant traded on material nonpublic information that he received from a company insider to benefit himself and his friends. They made over $1 million on these trades. Some of those friends were already extraordinarily wealthy individuals. Besides making money, the defendant gained access, relevance, and entrée into elite social circles through the provision of this information. He did so at the expense of public confidence in the market, and great time and expense of the government in investigating and prosecuting the scheme.

The defendant's tax evasion went hand-in-glove with his insider trading. Tax evasion is just another egregious form of cheating. The Supreme Court has long recognized that "[t]he United States has relied for the collection of its income tax largely upon the taxpayer's own disclosures rather than upon a system of withholding the tax from him by those from whom income may be received." Spies v. United States, 317 U.S. 492, 495 (1943). A functioning government relies on its citizens and residents to report timely, completely, and honestly all taxes they owe, which is why Congress has made it a criminal offense to file false returns or evade

income taxes.  As Justice Oliver Wendell Holmes stated, "[t]axes are what we pay for a civilized society . . . ." Compania General de Tabacos de Filipinas v. Collector of Internal Revenue, 275 U.S. 87, 100 (1927) (Holmes, J., dissenting). The multi-year tax evasion that the defendant perpetrated in this case cost the U.S. Treasury, and this nation's taxpayers, more than $1 million in actual losses and interest.  This was not the result of a one-time mistake or a fleeting lapse in judgment.  Time and time again, over the course of years, he made a conscious and deliberate choice to defraud the U.S. Government by lying about his income and claiming poverty when, in fact, he was purchasing luxury watches, yachting in the South of France, attending Formula One races with billionaires, and otherwise living a luxurious lifestyle.

2. The History and Characteristics of the Defendant

The PSR and the defendant's sentencing letter set forth compelling facts regarding the defendant's upbringing and family circumstances.  The government does not make light of these circumstances and acknowledges the difficulty of making one's way after enduring what the defendant has.  The Court must, and should, take these circumstances into account in fashioning a sentence.  These circumstances have informed the government's recommendation of a sentence below the applicable Guidelines range.

The other side of the coin is that, perhaps while struggling with his own demons, the defendant acted in ways that were selfish and harmed others.  Nearly every witness the government spoke with during this investigation—approximately 20—shared an anecdote in which the defendant lied to them, exaggerated his own credentials and wealth, borrowed money and failed to repay them, or damaged their business relationships in some way.  This suggests that the defendant's crimes were not particularly out of character, or an aberration from an otherwise ascetic life.  Rather, they were part of a lifestyle of inflated credentials and dishonest portrayals of one's wealth and access.

The defendant undoubtedly deserves mercy and support for the struggles he has endured in his life.  He also must be held accountable for his actions.

3. Affording Deterrence and Protecting the Public

The Court's sentence should also further the aims of general and specific deterrence.  See U.S.S.G. § 3553(a)(2)(B), (C).

There is a greater need for general deterrence for sophisticated fraud schemes like this that are difficult to detect and prosecute.  See, e.g., Harmelin v. Michigan, 501 U.S. 957, 988 (1991) (noting that "since deterrent effect depends not only upon the amount of the penalty but upon its certainty, crimes that are less grave but significantly more difficult to detect may warrant substantially higher penalties").  Moreover, because "economic and fraud-based crimes are more rational, cool and calculated than sudden crimes of passion or opportunity, these crimes are prime candidates for general deterrence." See, e.g., United States v. Martin, 455 F.3d 1227,

1240 (11th Cir. 2006) (quoting Stephanos Bibas, White–Collar Plea Bargaining and Sentencing After Booker, 47 Wm. & Mary L. Rev. 721, 724 (2005) (internal quotation marks omitted); United States v. Heffernan, 43 F.3d 1144, 1149 (7th Cir. 1994) ("Considerations of (general) deterrence argue for punishing more heavily those offenses that either are lucrative or are difficult to detect and punish, since both attributes go to increase the expected benefits of a crime and hence the punishment required to deter it."); Drago Francesco, Roberto Galbiati & Pietro Vertova, The Deterrent Effects of Prison: Evidence From a Natural Experiment, 117 J. of Political Econ. 257, 278 (2009) ("Our findings provide credible evidence that a one-month increase in expected punishment lowers the probability of committing a crime. This corroborates the theory of general deterrence.").

A 36-month sentence would serve the aims of both general and specific deterrence. A sentence of probation or home confinement for any crime, but particularly a white-collar crime, does not carry the same heft in deterring future conduct as does a term of incarceration. Given that the defendant committed multiple financial crimes over a period of years, the need for specific deterrence is higher here than in the case of a one-off bad decision. It is also imperative to send a message to other individuals who may be tempted by get-rich-quick schemes that their conduct will be met with serious consequences.

V.     Conclusion

For all the reasons articulated above, the government respectfully requests that the Court sentence defendant Jason Peltz to a 36-month term of incarceration.

Respectfully submitted,

BREON PEACE
United States Attorney

By:     /s/
Kaitlin T. Farrell
Sarah M. Evans
Assistant U.S. Attorneys
(718) 254-7000

c.c.:   Clerk of Court (NGG) (by ECF & Email)
        Jeremy Temkin and Ryan McMenamin (Attorneys for Defendant) (by ECF & Email)
        Michelle Malko, U.S.P.O. (by Email)